UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MATTHEW JAMES SCHAEFER,

                Plaintiff,                CIVIL ACTION NO. 13-10105

        v.                      DISTRICT JUDGE TERRENCE G. BERG

                              MAGISTRATE JUDGE MARK A. RANDON

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 14, 17)

Plaintiff Matthew James Schaefer challenges the Commissioner of Social Security's ("the Commissioner") final denial of his benefits application. Cross motions for summary judgment are pending (Dkt. Nos. 14, 17); Plaintiff also filed a reply (Dkt. No. 18). Judge Terrence G. Berg referred the motions to this Magistrate Judge for a Report and Recommendation (Dkt. No. 3).

## I.     RECOMMENDATION

Because the Administrative Law Judge's ("ALJ") RFC properly incorporated Plaintiff's non-exertional limitations, this Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be **DENIED**, Defendant's motion for summary judgment be **GRANTED**, and the Commissioner's findings be **AFFIRMED**.

## II.     DISCUSSION

### A. *Framework for Disability Determinations*

Under the Social Security Act (the "Act"), Disability Insurance Benefits and Supplemental Security Income are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of HHS*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### B.  Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited such that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses") (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion"); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a

zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *See Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of HHS*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party") (internal quotation marks omitted). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant").

### III.   REPORT

#### A.  *Administrative Proceedings*

Plaintiff applied for disability insurance benefits ("DIB") and supplemental security income ("SSI") on April 7, 2010, alleging a disability onset date of August 23, 2005; the Commissioner denied the application (Tr. 27). Plaintiff appeared with counsel for a hearing before ALJ Tammy A. Thames, who considered the case *de novo* (*Id.*). In a written decision, ALJ Thames found Plaintiff was not disabled (Tr. 27-43). Plaintiff requested an Appeals Council review (Tr. 7-19). On November 26, 2012, the ALJ's findings became the Commissioner's final administrative decision when the Appeals Council declined further review (Tr. 1-6).

### B. ALJ Findings

Plaintiff has a tenth grade education, past relevant work as a construction worker, welder, and construction laborer, and was 38 years-old on his alleged onset date (Tr. 33, 42). The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that he had not engaged in substantial gainful activity since August 23, 2005, the alleged onset of his disability (Tr. 29).

At step two, the ALJ found that Plaintiff had the following "severe" impairments: ulnar neuropathy of the left arm,[1] cervical and lumbar degenerative disc disease with residual neck and back pain,[2] and major depressive disorder (*Id.*).

At step three, the ALJ found no evidence that Plaintiff's impairments met or medically equaled one of the listings in the regulations (Tr. 29-32).

Between steps three and four, the ALJ found Plaintiff had the Residual Functional Capacity ("RFC") to:

> perform light work[3] . . . except he is able to lift and/or carry [20] pounds
> occasionally and [10] pounds frequently primarily using the right upper

---

[1] "Peripheral neuropathy, a result of nerve damage, often causes weakness, numbness and pain, usually in your hands and feet, but it may also occur in other areas of your body. . . . Peripheral neuropathy can result from problems such as traumatic injuries, infections, metabolic problems and exposure to toxins. . . . In many cases, peripheral neuropathy symptoms improve with time, especially if the condition is caused by an underlying condition that can be treated." *See* http://www.mayoclinic.com/health/peripheral-neuropathy/DS00131 (last accessed December 31, 2013).

[2] "Degenerative disc disease is not really a disease but a term used to describe the normal changes of the discs in the spine as a person ages. The breakdown of the discs can result in back or neck pain, as well as osteoarthritis, herniated disc, or spinal stenosis." *See* http://www.webmd.com/hw-popup/degenerative-disc-disease (last accessed December 31, 2013).

[3] Light work involves:

> extremity and using the left upper extremity for guiding purposes. He is
> able to stand and/or walk about six hours in an eight-hour workday and sit
> about six hours in an eight-hour workday. He has the ability to understand,
> remember, and carry out simple instructions and perform simple tasks
> with no production rate pace work, but rather goal-oriented work. The
> claimant must have no more than occasional interaction with the public or
> co-workers.

(Tr. 32).

At step four, the ALJ found that Plaintiff could not perform any of his past relevant work

(Tr. 42).

At step five, the ALJ found Plaintiff was not disabled, because he could perform a

significant number of jobs in the national economy (Tr. 43).

### C. Administrative Record

#### 1.      Plaintiff's Hearing Testimony and Statements[4]

Plaintiff most recently worked at a builders' company, where he read building plans and

supervised others (Tr. 53-55). He stopped working in August of 2005: he had been experiencing

pain in his lower back, aggravated by driving long distances to work, when – to make matters

---

> lifting no more than 20 pounds at a time with frequent lifting or carrying of
> objects weighing up to 10 pounds. Even though the weight lifted may be very
> little, a job is in this category when it requires a good deal of walking or standing,
> or when it involves sitting most of the time with some pushing and pulling of arm
> or leg controls. To be considered capable of performing a full or wide range of
> light work, you must have the ability to do substantially all of these activities. If
> someone can do light work, we determine that he or she can also do sedentary
> work, unless there are additional limiting factors such as loss of fine dexterity or
> inability to sit for long periods of time.

20 C.F.R. § 404.1567.

[4] Plaintiff's testimony before the ALJ reflects his subjective view of his medical
condition, abilities, and limitations; it is not a factual finding of the ALJ or this Magistrate Judge.

worse – he tripped, fell, and injured his back on the job (Tr. 55). After his fall, he missed six

days of work (*Id.*). As a result, he was fired (*Id.*).

Soon after, Plaintiff began treating with Dr. Lawrence (Tr. 56). He ordered an MRI on

Plaintiff's lower back, which was negative, and prescribed medications for pain and

inflammation (Tr. 56-57). Plaintiff did not find the medications helpful: they caused him to

vomit and gag (*Id.*). Despite his complaints, doctors continued to prescribe the same medications

(*Id.*).

In 2007, Plaintiff treated at Bay City Regional Medical Center for arm pain; he did not

seek treatment for back pain at that time (Tr. 58).

In late 2008, Plaintiff treated at Beaumont Hospital after a bow-hunting mishap sent an

arrow into his left arm, severing a nerve; he did not simultaneously seek treatment for his back

(Tr. 59-60). Two days later, a specialist performed surgery to reconnect Plaintiff's damaged

nerve (Tr. 60). He was discharged that same day with pain medication and an antibiotic (*Id.*).

After his hunting accident, Plaintiff did not go to a clinic to manage back or arm pain: he

could not afford treatment (Tr. 60). But he continues to experience constant pain in his left arm

(Tr. 76). He was prescribed medical marijuana approximately one year ago, and uses it primarily

at night (Tr. 65-67, 76). It helps him to sleep, socialize without being in a bad mood, and it

relaxes his back; but, marijuana does not alleviate his pain (Tr. 67, 76).

Plaintiff does not trust his left arm to carry things: he frequently drops items, such as

containers of milk or pop (Tr. 61). He can extend his left arm, but avoids using it because he

feels a shock when it touches anything (Tr. 61-62). Plaintiff relies more on his non-dominant

right arm, although it also hurts; with it, he can sweep the floor and clean the counters (*Id.*, Tr.

64). With Plaintiff's left hand, he has difficulty putting on socks (he cannot feel two of his

fingers); buttoning shirts; and, hanging on to things (Tr. 63-64). He also experiences problems with sensation: when he places his left hand under hot water, it feels cold; when he places it under cold water, it feels hot (Tr. 65). Nevertheless, a specialist informed him that nothing more could be done; his left arm surgery was as successful as it could have been (*Id.*).

Pain interferes with Plaintiff's ability to concentrate (Tr. 76). He has trouble focusing on what he is doing and cannot sustain concentration long enough to watch a television show; he misses half of what happens because of back pain (Tr. 76-77).

Plaintiff has also had emotional problems since his parents divorced when he was 14 (Tr. 68-69). He has never been treated for depression or anxiety, and although he did meet with a mental health professional while in prison, he did not share any information and received no medication (Tr. 69). Plaintiff would like to see a counselor, but cannot afford to (Tr. 78).

When he is in social situations, Plaintiff feels uncomfortable, scared, anxious, and sick; he prefers to spend his time alone, despite living with his father and near all of his family – he does not like most of them (Tr. 53, 70, 77). While working, Plaintiff was easily annoyed by his coworkers; they made him nervous (Tr. 73-74). At many of his jobs, these feelings would eventually lead to a confrontation between Plaintiff and coworkers, and he would leave his job (Tr. 74). These problems began at a young age – Plaintiff fought often as a child, and was expelled from a few different school districts (Tr. 75). He was also imprisoned because of an assault charge (*Id.*).

Plaintiff lives in a house with his father (Tr. 53). On a normal day, he helps out around the house (although he does not do dishes); plays with his dogs; feeds his chickens; or, lies in the sun – it feels good when the sun hits his back (Tr. 71). He typically leaves the house once a day to feed his friend's chickens and play with his friend's dog (Tr. 74-75). Plaintiff drives once in a

while and can prepare sandwiches and do his own laundry, but he avoids going to the grocery store unless it is absolutely necessary (Tr. 71-72).

## 2.  Relevant Medical Evidence[5]

On May 23, 2007, Plaintiff presented to consultative examiner Kerstyn C. Zalesin, M.D. (Tr. 329-33). He reported anxiety and depression, exacerbated by his inability to gain employment; he experienced difficulty finding a job because of his prison record (Tr. 329).

On May 31, 2007, Plaintiff was evaluated for the state DDS by Sally J. Glowicki, M.A., LLP (Tr. 335-41). He stated that he could not work a full time job because his "back, [] hemorrhoids, [] shoulders [], [and] knee hurt" (Tr. 335). At its worst, Plaintiff's daily pain was between a five and six out of ten; he was taking a muscle relaxant, an anti-inflammatory, and a pain pill three times daily (Tr. 335, 338). He reported frequent thoughts of suicide that began at age 14 and continued into the last year and two suicide attempts while in prison, but had never been diagnosed with depression (*Id.*). Plaintiff described frequent behavioral problems as a child – he fought often and acted disrespectfully at school; anger problems – the last time he lost his temper was three months ago; a learning problem that caused him difficulty reading or understanding a newspaper; daily irritability and crying spells; and, constant anxiety about being arrested – he was sick of going to jail (Tr. 335-36). Plaintiff's longest job lasted 13 years, but he was fired three times from other jobs because of interpersonal conflict with coworkers or supervisors (Tr. 336). Over time, he had been arrested "about 50 times" for various charges, including breaking and entering, attempted murder, kidnapping, extortion, assault, and malicious aiming of a gun; he has spent many days in jail and two and a half years in prison (Tr. 337).

---

[5] Because Plaintiff's claims relate only to non-exertional limitations, that evidence which relates only to Plaintiff's physical impairments is not discussed here.

Plaintiff reported a good relationship with his daughter, who he sees often, but a conflicted

relationship with his parents – he does not have much contact with either (*Id.*). He has a couple

friends, but prefers to be by himself (*Id.*).

      Plaintiff was able to understand and reply to questions and instructions throughout the

evaluation; exhibited poor insight, judgment, and motivation; presented with signs and

symptoms of depression, including loss of energy, restlessness, sleep disturbance, diminished

concentration, and anhedonia; and, revealed no pain behaviors (Tr. 337-39). Glowicki opined

that Plaintiff met the criteria for antisocial personality disorder because of his arrest record,

history of aggressiveness and irritability, impulsivity, relationship problems, and irresponsibility

(Tr. 339). She diagnosed pain disorder associated with both psychological factors and a general

medical condition; recurrent moderate major depressive disorder; polysubstance and nicotine

dependence; and, antisocial personality disorder (Tr. 340). She assigned a GAF of 52[6] (*Id.*).

      On June 18, 2007, Robert Newhouse, M.D., provided a mental RFC assessment upon

review of Plaintiff's medical records (Tr. 344-46). He opined that Plaintiff was moderately

limited in his ability to understand, remember, and carry out detailed instructions; maintain

---

    [6] The GAF score is:

    a subjective determination that represents the clinician's judgment of the individual's
    overall level of functioning. It ranges from 100 (superior functioning) to 1 (persistent
    danger of severely hurting self or others, persistent inability to maintain minimal personal
    hygiene, or serious suicidal act with clear expectation of death). . . . A GAF of 41 to 50
    means that the patient has serious symptoms . . . OR any serious impairment in social,
    occupational, or school functioning (e.g., no friends, unable to keep a job). A GAF rating
    of 51 to 60 signals the existence of moderate difficulty in social or occupational
    functioning.

*White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009). "A GAF score may help an
ALJ assess mental RFC, but it is not raw medical data. Rather, it allows a mental health
professional to turn medical signs and symptoms into a general assessment, understandable by a
lay person, of an individual's mental functioning."  *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed.
App'x. 496, 502 n. 7 (6th Cir. 2006).

attention and concentration for extended periods; work in coordination with or proximity to others without being distracted; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and, get along with coworkers or peers without distracting them or exhibiting behavioral extremes (Tr. 344-45). He opined that Plaintiff was independent in daily skills unless limited by physical complaints, and retained the ability to do simple tasks on a sustained basis (Tr. 346).

On the same date, Dr. Newhouse also completed a Psychiatric Review Technique form (Tr. 348-361). He diagnosed major depression, pain disorder with mental and physical factors, antisocial personality disorder, and polysubstance abuse; he found mild restriction in his activities of daily living and moderate difficulty in maintaining social functioning and concentration, persistence, and pace (Tr. 361).

On December 17, 2007, Plaintiff presented to Bay Regional Medical Center (Tr. 362). Treatment notes state "[patient] wants to know why his back hurts so badly that he hasn't been able to work for the past [three] years"; he was non-compliant with treatment and stated that he had stopped taking medications because they did not work (*Id.*). Plaintiff was prescribed a muscle relaxer, pain medication, given back exercises, and advised to be compliant (*Id.*).

On July 1, 2010, Plaintiff presented to Michael Brady, Ph.D., for a consultative mental health evaluation (Tr. 463-66). Plaintiff described a history of depressive symptoms, which intensified after his 2008 bow-hunting injury: he cannot do anything – even sleep – because of his pain; he was experiencing feelings of worthlessness, daily thoughts of suicide (but no plans), anhedonia, decreased concentration, sleep disturbance, and irritability (Tr. 463). He was not taking any medications (*Id.*). Plaintiff had been living with a friend for the last two months; described a few close friends with whom he regularly spoke; and stated that he is not close with

-11-

his family members, but does attend church occasionally with his daughter (Tr. 464). The examination revealed unimpaired ability to understand, recall, and complete tasks and expectations; poor ability to relate to and interact with others – including coworkers and supervisors – because of his pain, irritability, and distress; poor ability to maintain concentration because of pain; and, fair ability to withstand the normal stressors associated with a workplace setting (Tr. 466). She diagnosed recurrent, moderate depressive disorder, and assigned a GAF of 60 (*Id.*).

On July 7, 2010, Ron Marshall, Ph.D. rendered a mental RFC assessment after a review of Plaintiff's medical records (Tr. 101-04). With respect to Plaintiff's sustained concentration and persistence limitations, he opined that Plaintiff was moderately limited in the ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; and, work in coordination with or in proximity to others without being distracted (Tr. 101-02). He noted that Plaintiff may have difficulty retaining complex instructions over extended time periods, and irritability in response to pain will adversely affect working with others (Tr. 102). With respect to Plaintiff's social interaction limitations, Dr. Marshall opined that Plaintiff was moderately limited in the ability to interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and, respond appropriately to changes in the work setting (Tr. 102-103). He explained that Plaintiff retained the ability to do rote tasks within medical limitations and follow instructions, but may have difficulty with complex instructions and work better with brief interactions with others (Tr. 103).

On August of 2010, Muhammad Ahmed, M.D., rendered a physical RFC assessment after a review of Plaintiff's medical records (Tr. 477-86). Dr. Ahmed opined that Plaintiff's activities of daily living were fairly consistent with the medical evidence in that Plaintiff has

some depression issues, but it does not seem to inhibit him from performing daily activities (Tr. 482).

On July 7, 2010, Plaintiff presented to R. Scott Lazzara, M.D., for a consultative examination (Tr. 471-75). He complained of back, knee, and shoulder pain; neck and skull problems; nerve damage; arthritis; and, depression (Tr. 471). Dr. Lazzara found intact immediate, recent, and remote memory with normal concentration and appropriate insight and judgment; Plaintiff was cooperative in answering questions and following commands (Tr. 472). Dr. Lazzara opined that supportive care and anti-inflammatories would be helpful for Plaintiff's back pain; his history of depression and apathy appeared to be impairing his remediability, but he remained capable of daily activities and sedentary activities (Tr. 474).

On June 4, 2011, George Pestrue, Ph.D., evaluated Plaintiff's mental status (Tr. 487-94). Plaintiff complained of bipolar disorder, social anxiety disorder, and cognitive defects, but his back was his biggest problem – it hurt him constantly (Tr. 487). He reported loneliness, anger, suicidal ideations, lack of tiredness, depression, and frustration; fights as a child; a family history of suicide; mood swings; a dislike for most people; difficulty getting along with others; poor self-esteem; anxiety and nervousness in public places; avoidance of crowds; and, strong anxiety attacks and an increase in anger when around groups of people (Tr. 487-88, 491). Plaintiff did not think he could work around people, because his quick temper had become worse since he injured his back, and he was afraid that he would lash out at others – he was on edge all the time (Tr. 488). Marijuana was Plaintiff's only medication (*Id.*). Plaintiff mentioned one good friend: they would sometimes dig up worms and fish, take short drives, or go mushroom hunting in the woods together; Plaintiff would sometimes help him with his house (Tr. 490). Dr. Pestrue found Plaintiff to be strongly depressed and moderately to strongly anxious, with flat affect; he

-13-

expressed no anger toward Dr. Pestrue (Tr. 491). Dr. Pestrue opined that Plaintiff's social anxieties and uncontrolled mood swings would make it difficult for him to work in social situations, and his severe depression – along with anxieties and chronic pain – will make it difficult for him to focus, concentrate on, and complete mental tasks (Tr. 493). He diagnosed bipolar disorder, social anxiety disorder, and assigned a GAF of 47.[7]

On the same day, Dr. Pestrue completed a mental RFC assessment (Tr. 495-96). He opined that Plaintiff was markedly limited in his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods (due to racing thoughts and pain); perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances (medical problems interfere with his sleep and concentration, and would make him unreliable); complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and, accept instructions and respond appropriately to criticism from supervisors, (due to his inability to handle criticism and proneness to angry outbursts) (Tr. 495-96). Plaintiff was moderately limited in his ability to work in coordination with or proximity to others without being distracted, and his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes (Tr. 495-96).

### 3.    Vocational Expert

The ALJ asked a vocational expert ("VE") to assume a hypothetical individual of Plaintiff's age, education, and past work experience who could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds, primarily using the right upper extremity while

---

[7] *See id.*

-14-

using the left upper extremity for guiding purposes; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; and, understand, remember, and carry out simple instructions and perform simple tasks (Tr. 83). The work could not involve production-rate pace work, but rather goal-oriented work with no more than occasional interaction with the public or coworkers (*Id.*). The VE testified that such an individual could not perform Plaintiff's past relevant work, but could perform other jobs in the national and regional economy: surveillance systems monitor, packager, and checker/inspector (Tr. 83-85).

The ALJ presented a second hypothetical to the VE: maintaining the same physical limitations as in the first hypothetical, the individual could not – on a regular and sustained basis – understand, remember, and carry out very short and simple instructions; maintain regular attendance and punctuality; sustain an ordinary routine without special supervision on a frequent basis; and, work in coordination with or proximity to others (*i.e.*, essentially no interaction with the public or coworkers) (Tr. 85-86). The VE testified that such an individual would be precluded from work (Tr. 86).

The VE next testified that the pertinent employers would tolerate no more than two days a month of unexcused absences; substantial tardiness would be tolerated to the same extent (Tr. 86).

-15-

### D.  Plaintiff's Claims of Error[8]

#### 1.        Moderate Limitations in Concentration, Persistence, and Pace

Plaintiff argues that the ALJ's RFC – and by extension, the first hypothetical question to the VE – failed to incorporate his moderate limitations in concentration, persistence, and pace.

"In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010). There is relevant authority ordering remand where an ALJ's hypothetical does not include a specific reference to moderate limitations in concentration, persistence, or pace ("CPP"), and only limits the hypothetical individual to unskilled work or simple, routine tasks. However, there is also authority that has found an ALJ formed an accurate hypothetical by limiting the claimant to unskilled work and omitting a moderate CPP limitation. In analyzing the case law, this Magistrate Judge agrees that a hypothetical simply limiting a claimant to unskilled work may, in some instances, fail to

_____

[8] Plaintiff also purports to make arguments related to the ALJ's credibility assessment and the weight afforded to consultative and evaluative medical opinion evidence, primarily in a portion of his motion entitled "Statement of the Case," which is largely Plaintiff's recitation of the ALJ's decision (Dkt. No. 14 at pp. 5-13 (CM/ECF)). But Plaintiff provides very little elaboration and *no* legal authority. Defendant acknowledged this in its motion, yet presented substantiated arguments anyway; and although in his reply, Plaintiff responds ireiterates segments of his assessment in his reply as well, those are no better substantiated (Dkt. No. 18). As such, these purported arguments should be waived. *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir.1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones."); *Baldwin v. Astrue*, No. 08–395, 2009 WL 4571850, at *3 (E.D. Ky. Dec.1, 2009) ("Plaintiff is represented by counsel, and the Court is not required to formulate arguments on [] Plaintiff's behalf"). Moreover, although Plaintiff takes issue with the ALJ's assessment of evidence, he simultaneously seems to concede that – consistent with the ALJ's findings – his limitations in both concentration, persistence, and pace and social functioning were *moderate* (Dkt. No. 14 at p. 15 (CM/ECF); Dkt. No. 18 at p. 4 (CM/ECF)).

capture a claimant's moderate CPP limitations; the difficulty of a task does not always account for the difficulty of staying on task. *See e.g., Green v. Comm'r of Soc. Sec.*, No. 08–11398, 2009 WL 2365557, at *10 (E.D. Mich. July 28, 2009) ("It is difficult to reasonably accept 'moderate' meaning anything less than 20%–30% of the time at work. Thus, 'moderate' concentration problems . . . need to be included or accommodated in some suitable fashion in the [VE] hypothetical . . . . Simply including the hypothetical of unskilled jobs with limited contact with co-workers and the public is not sufficient."); *Edwards v. Barnhart*, 383 F. Supp. 2d 920, 930 (E.D. Mich. 2005) ("Plaintiff may be unable to meet quotas, stay alert, or work at a consistent pace, even at a simple, unskilled, routine job."). Accordingly, Plaintiff cites such authority (Dkt. No. 14 at pp. 16-17,[9] citing *Edwards*, 383 F. Supp. 2d at 930-31).

However, there is no bright-line rule requiring remand whenever an ALJ's hypothetical includes a limitation of "unskilled, routine work," but excludes explicit language denoting moderate CPP limitations. Rather, this Court must look to the record as a whole and determine whether substantial evidence supports the ALJ's RFC. *Hess v. Comm'r of Soc. Sec.*, No. 07-13138, 2008 WL 2478325, at *7 (E.D. Mich. June 16, 2008).

In *Hess*, the state agency doctor found that the claimant suffered moderate CPP limitations, such that the claimant had limitations in performing at a consistent pace. *Id*. However, the doctor ultimately concluded that the claimant retained the ability to perform unskilled tasks on a sustained basis. *Hess*, 2008 WL 2478325, at *4. The court concluded that because the ALJ relied on the state doctor's finding of a moderate CPP impairment, it was reasonable for the ALJ to also rely on that doctor's ultimate conclusion that the claimant could

---

[9] All page numbers refer to CM/ECF pagination.

-17-

perform unskilled work on a sustained basis, and, accordingly, to omit a concentration-based limitation from the hypothetical. *Id*. at *8.

Here, the pertinent portion of the ALJ's RFC was not limited to the simplicity of tasks that Plaintiff remained capable of performing; the ALJ included an explicit pace limitation: "[h]e has the ability to understand, remember, and carry out simple instructions and perform simple tasks with no production rate pace work, but rather goal-oriented work" (Tr. 32). Thus, unlike some of the above-cited authority where RFCs were deemed insufficient – including *Edwards* – the ALJ included a limitation explicitly designed to account for the persistence and pace portion of his moderate CPP limitations. Plaintiff asserts that this restriction to goal-oriented work nevertheless fails to sufficiently address his moderate CPP limitations (Dkt. No. 14 at p. 17).

But, he states no reason why this is the case.

Instead, Plaintiff argues, it is the ALJ's *second* hypothetical – which, he emphasizes, elicited the VE's testimony that work would be precluded – that is an accurate representation of Plaintiff's CPP limitations. It provided that an individual would be unable – on a regular and sustained basis – to "understand, remember and carry out very short and simple instructions[; ] maintain regular attendance and be punctual[;] sustain an ordinary routine without special supervision on a frequent basis[; and,] work in coordination with or proximity to others – essentially no interaction with the public or coworkers" (Dkt. No. 14 at pp. 15-16, citing Tr. 85-86). Plaintiff's argument thus boils down to a request that this reviewing court find substantial evidence to support this hypothetical, simply because it resulted in a finding that Plaintiff was incapable of sustained, full-time employment. Aside from being questionable reasoning, Plaintiff fails to point to any specific evidence that supports the hypothetical's provisions. *See Lewicki v. Comm'r of Soc. Sec.*, No. 09-11844, 2010 WL 3905375, at *3 (E.D. Mich. Sept. 30, 2010)

-18-

("There may be cases where such moderate limitations preclude the performance of even some simple, unskilled tasks. Plaintiff does not, however, explain why the facts of this particular case require a more detailed hypothetical question to adequately account for his own moderate limitations in concentration, persistence, or pace.").

Meanwhile, in making his determination, the ALJ provided a thorough discussion of the record evidence. She noted that, despite Plaintiff's allegations of concentration limitations, he described a variety of daily activities – many of them simple tasks – that he could perform (Tr. 38). Plaintiff claims "[t]he fact that an individual may occasionally walk a dog, feed chickens, clean a counter top with his good arm, or do a load of laundry, in no way translates into a functional ability to engage in substantial gainful activity and sustain employment" (Dkt. No. 14 at p. 11). But these daily activities constitute evidence sufficient to call into doubt the proposition that Plaintiff is completely unable to concentrate on simple, non-production rate tasks; the ALJ reasonably assessed such activities as evidence, first, indicative of a moderate CPP limitation, and second, that demonstrated Plaintiff's intact ability to perform simple, unskilled tasks. Plaintiff does not offer evidence to suggest otherwise.

The ALJ next discussed at length the opinion evidence of record. For example, in May of 2007, Plaintiff was evaluated by LLP Glowicki, who noted poor judgment and motivation, but a cooperative attitude and logical, organized stream of mental activity; she assigned a GAF of 52, an assessment consistent with moderate impairment (Tr. 36, 337-39). Approximately one month later, non-examining consultative physician Dr. Newhouse – after finding a number of moderate limitations in Plaintiff's CPP skill set – found Plaintiff able to perform simple tasks on a sustained basis, unless he were "limited by [his] physical complaints" (Tr. 39, 346).

-19-

In June of 2010, Dr. Brady assessed poor or fair limitations in Plaintiff's ability to maintain concentration, withstand normal stressors associated with the workplace, and relate to and interact with others, because of pain (Tr. 39, 466). Nevertheless, Dr. Brady simultaneously concluded that Plaintiff was able to understand, recall, and complete tasks and expectations *without impairment* (Tr. 39, 466). He also assigned a GAF of 60, again representing findings consistent with moderate impairment (Tr. 39, 466).

The ALJ also took note that Dr. Brady's opinion emphasized Plaintiff's impairments' association with subjective complaints of pain, and afforded his opinion limited weight (Tr. 39). Plaintiff takes issue with this, stating that the ALJ is not in a position to negate the findings of examining consultative physicians simply because physically-rooted pain affects non-exertional impairments: "[w]hether these impairments were 100% related to [Plaintiff]'s mental state or 75% related to[his] mental state and 25% based on his chronic pain is irrelevant[; t]he point was that [Plaintiff] was impaired and the impairment was measureable through the doctor's psychological evaluation" (Dkt. No. 18 at p. 2). But, as discussed above, the ALJ's RFC's incorporation of non-exertional limitations are not inconsistent with the ultimate findings of the opinion evidence.

Moreover, the ALJ discounted Plaintiff's testimony regarding the severity of his pain, finding that "[t]he medical evidence of record shows [Plaintiff] has some limitations resulting from cervical and lumbar disc disease; however it does not support the disabling level of limitations alleged" (Tr. 35). The ALJ then went on to discuss at length reasons why Plaintiff's complaints of disabling pain were not fully credible (Tr. 35-36). Notably, in 2007, Plaintiff stated that, at its *worst*, his daily pain was between a five and six out of ten (Tr. 335, 338). Plaintiff does not substantiate an argument challenging the ALJ's credibility determination (Tr. 34-36).

Plaintiff also asserts the ALJ's flawed assessment of examining consultative physician Dr. Pestrue – who opined marked limitations in functional abilities related to Plaintiff's CPP and a GAF of 47, and whose findings largely reflected in the ALJ's second hypothetical – as support that the ALJ's RFC did not accurately reflect his non-exertional limitations. Plaintiff essentially asks this Magistrate Judge to find Dr. Pestrue's opinion sufficient to negate the substantial evidence otherwise supportive of the ALJ's RFC because Dr. Pestrue – whose opinion was afforded little weight – evaluated Plaintiff; yet, non-examining sources' opinions were afforded considerable weight. But, the ALJ reasonably discounted Dr. Pestrue's opinion because Dr. Pestrue – a psychologist assigned to conduct a mental status evaluation – partially opined on the effect of Plaintiff's reported physical ailments, and his opinion partially relied on Plaintiff's inconsistent report of daily activities: "[a]lthough Dr. Pestrue opined the claimant had marked limitations in his ability to maintain concentration and attention due to pain and racing thoughts, as previously noted, the claimant reported he was able to perform odd jobs for his friends and family, watch television, and occasionally fish and hunt (Tr. 40, 290, 464, 490).

There is no dispute that Plaintiff has considerable CPP limitations: the ALJ accommodated for moderate CPP limitations after reasonably evaluating all record evidence, while accounting for partially credible allegations of pain and reports of daily activities, the latter being particularly important because they are likely to demonstrate what Plaintiff can *do* in lieu of his individualized set of impairments. *See Sutherlin v. Comm'r of Soc. Sec.,* No. 10-10540, 2011 WL 500212, at *2 (E.D. Mich. Feb.8, 2011) ("[T]he administrative law judge was not required to incorporate the broad terminology of the [moderate CPP limitations] verbatim. Rather, as required, the administrative law judge carefully considered and evaluated the credibility of all the relevant evidence when making the residual functional capacity

determination and transforming [Plaintiff's] restrictions into concrete terms"). The ALJ's RFC

thus accounted fully for the broader findings of examining and non-examining consultative

mental health professionals, which suggest that Plaintiff could successfully perform simple, goal-

oriented occupational tasks. As such, the ALJ's RFC adequately accounted for Plaintiff's

moderate CPP limitations, and it should not be disturbed on appeal.

### 2.    Moderate Limitations in Social Functioning[10]

Plaintiff next argues that the ALJ's RFC's limitation of occasional contact with co-

workers and the general public did not sufficiently accommodate his moderate limitations in

social functioning (Dkt. No. 14 at p. 17). In pertinent part, the ALJ's RFC and first hypothetical

provided for the following: "[t]he claimant must have no more than occasional interaction with

the public or co-workers" (Tr. 32).

Much of what is discussed above applies here; in effect, Plaintiff's arguments for each

respective categorical functional limitation tend to convolute one another. With that in mind,

Plaintiff claims that the ALJ neglected to incorporate his impairments' detrimental effect on his

ability to work with supervisory personnel (Dkt. No. 14 at pp. 17-18).

On a preliminary note, any particular difficulty Plaintiff purports to have with supervisors

is not necessarily inconsistent with the ALJ's RFC: a category of "coworkers" does not

necessarily exclude supervisors. Nevertheless, in making his determination, the ALJ conducted

an extensive and accurate review of the evidence, both medical and testimonial.  During his May

2007 consultative exam, Plaintiff alleged that he had been fired three times for interpersonal

---

[10] Plaintiff's motion also frames the issue as an assertion that the ALJ neglected to
incorporate severe emotional impairments into her RFC, citing to bipolar disorder and social
anxiety disorder. This issue is essentially within the question of whether the ALJ's RFC
adequately incorporated Plaintiff's limitations in social functioning.

conflict in the workplace (Tr. 31, 336). However, as the ALJ noted, he reported in a May 16, 2010 function report that, while he did not like people, he got along "all right" with authority figures, including bosses, and had never been fired or laid off from a job because of problems getting along with others (Tr. 31, 291-92). Although Plaintiff did testify to – and the record supports – his minimal patience with coworkers, Plaintiff reported improvement in his ability to get along with people with marijuana use; moreover, he did not testify expressly to any particular issues with supervisors during his hearing (Tr. 31, 67). Furthermore, the ALJ afforded considerable weight to the opinions of Dr. Marshall and Dr. Newhouse – who opined Plaintiff was moderately limited in his ability to respond appropriately to criticism from supervisors, and little weight to Dr. Pestrue, who opined that Plaintiff was markedly limited (Tr. 39-40, 101-04, 344-45, 495-96).

Plaintiff offers no reason why the ALJ's assessment is erroneous. Moreover, as Defendant points out (Dkt. No. 17 at p. 24), it is inconsistent for Plaintiff to claim that the ALJ's second hypothetical – which set forth an individual in need of regular supervision at work – is more closely in line with Plaintiff's limitations in social functioning.

With respect to Plaintiff's difficulty interacting with the public, the ALJ noted that he experienced nervousness and panic attacks in public; as a result, he would avoid going to the grocery store at times when the store would be most crowded (Tr. 31, 488). Meanwhile, Plaintiff maintains a good relationship with one friend – with whom he fishes, hunts for mushrooms, and chats – and his daughter; he occasionally attends church (Tr. 31, 464). Plaintiff points to no reason why he would be unable to withstand occasional interaction with the public.

The ALJ's RFC's accommodation of Plaintiff's moderate limitations in social functioning is likewise supported by substantial evidence. It should not be disturbed on appeal.

IV.     CONCLUSION

Because substantial evidence supports the Administrative Law Judge's ("ALJ") decision, this Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be **DENIED**, Defendant's motion for summary judgment be **GRANTED**, and the Commissioner's findings be **AFFIRMED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Sec'y of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.

s/Mark A. Randon
Mark A. Randon
United States Magistrate Judge

Dated:  January 8, 2014

-24-

<u>*Certificate of Service*</u>

*I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, January 8, 2014, by electronic and/or ordinary mail.*

<u>*s/Eddrey Butts*</u>
*Case Manager for Magistrate Judge Mark A. Randon*